UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                 :

JOSE PEGUERO, *et al.*,                :
                                 :

                       Plaintiffs,  :       12-CV-5184 (JPO)
           -v-                 :
                                 :       <u>OPINION AND ORDER</u>

CITY OF NEW YORK, *et al.*,      :
                                 :

                       Defendants. :
                                 :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      On July 22, 2009, Maximo Peguero ("Peguero") was shot and killed by an officer of the

New York City Police Department ("NYPD") following a police pursuit of his automobile in

Manhattan.  Plaintiffs Jose Peguero and Rafaela Cabral ("Plaintiffs") are Peguero's parents.

They brought this action under 42 U.S.C. § 1983 ("Section 1983"), on their own behalf and on

behalf of Peguero's estate, against the City of New York and two individual police officers,

Officer Christopher Labate and Sergeant Daniel Schwarz.[1]  Plaintiffs allege that Defendants used

---

[1] Plaintiffs have dropped their claims against the New York City Law Department.  (Dkt. No. 32, Memorandum of Law in Opposition to the Motion for Summary Judgment ("Opp. Memo"), at 8 n.3.)  They have also failed to identify any of the John Doe Defendants.  District courts are counseled not to dismiss suits against Doe defendants "until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials."  *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).  "Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, however, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."  *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (brackets and internal quotation marks omitted).  To the Court's knowledge, Plaintiffs have not attempted to ascertain the identity of the Doe Defendants.  On the contrary, they appear to have abandoned their claims against the Doe Defendants altogether.  Plaintiffs' claims against the Doe Defendants are accordingly dismissed without prejudice.

excessive force against Peguero and deprived Plaintiffs of his companionship and association. Defendants move for summary judgment on both claims.

For the reasons that follow, Defendants' motion is granted.

## I.      Background

### A.      Factual Background[2]

Labate and Schwarz were, at all relevant times, NYPD officers assigned to the 34th Precinct in northern Manhattan.  At approximately 8 p.m. on July 22, 2009, they received a radio transmission from an officer assigned to the adjacent 33rd Precinct.  (Modafferi Decl. Ex. E, Affidavit of Christopher Labate ("Labate Aff."), ¶ 2; *id.* Ex. F, Deposition of Daniel Schwarz ("Schwarz Dep."), 36:10–18.)  The officer advised that police were in pursuit of a vehicle—a gray Cadillac—in connection with an armed robbery.[3]  (Labate Aff. ¶¶ 3–4; Schwarz Dep. 36:16–37:5.)  Police lost track of the vehicle on the Henry Hudson Parkway.  (Schwarz Dep. 38:16–17.)

Some moments later, another officer—Sergeant Saleh, of the 34th Precinct—radioed that he had spotted the Cadillac exiting the Hudson Parkway at Dyckman Street.  (Def. 56.1 Stmt

---

[2] The following facts are drawn, unless otherwise indicated, from the following submissions made in connection with the instant motion: Defendants' Rule 56.1 Statement (Dkt No. 23 ("Def. 56.1 Stmt")); Plaintiffs' Rule 56.1 Statement (Dkt. No. 33, ("Pl. 56.1 Stmt")); the Declaration of Matthew J. Modafferi in Support of the Motion for Summary Judgment (Dkt. No. 24 ("Modafferi Decl.")), and the exhibits attached thereto; and the Affirmation of Ambrose Wotorson and Victor Dunlop in Opposition to the Motion for Summary Judgment (Dkt. No. 31 ("Wotorson Aff.")), and the exhibits attached thereto.  The facts are undisputed unless otherwise noted.

[3] Police initiated the pursuit after a complainant called 911 and reported that he had been robbed at gunpoint.  (Modafferi Decl. Ex. G at 1.)  The complainant later admitted, however, that he had not been robbed, but merely "swindled out of money."  (*Id.*; Def. 56.1 Stmt at 3 n.2.)  The complainant was arrested for making a false report.  (Modafferi Decl. Ex. G at 5.)

¶ 9.)  Saleh advised that he had pursued the Cadillac, but that it "rammed his car when he attempted to stop it."  (*Id.* ¶ 10.)

Labate and Schwarz then heard a transmission relaying that the Cadillac was headed southbound on Wadsworth Terrace.[4]  (*Id.* ¶ 11.)  Around the same time, Schwarz and Labate left the 34th Precinct station house to pursue the Cadillac.  (*Id.* ¶ 12.)  They drove northbound on Wadsworth Avenue in an attempt to intercept the vehicle at 188th Street, a one-way eastbound street.  (Schwarz Dep. 41:23–42:6.)  As Schwarz and Labate arrived at 186th Street and Wadsworth Avenue, they saw the Cadillac crossing Wadsworth and heading east on 188th Street.  (Def. 56.1 Stmt ¶ 14.)  They made a right turn and drove east on 186th Street, taking a path parallel to that of the Cadillac.  (*Id.* ¶ 15.)

For the next two blocks, Schwarz and Labate kept pace with the Cadillac.  (Schwarz Dep. 42:12–20.)  At Amsterdam Avenue, Schwarz and Labate turned left in an attempt to intercept the Cadillac.  (*Id.* at 43:2–4.)  The officers did not immediately see the Cadillac, however, and as they drove past 188th Street they observed the Cadillac continuing to make its way east on 188th Street toward Amsterdam Avenue, weaving between double-parked cars on both sides of the one-way street.  (*Id.* at 43:6–20.)  Labate and Schwarz made a U-turn and parked their car on the northwest corner of 188th Street and Amsterdam Avenue.  (*Id.* at 43:11–12, 44:8–12.)  The

---

[4] Plaintiffs object that Saleh's statements are inadmissible on the ground that they constitute hearsay.  (*See* Pl. 56.1 Stmt ¶¶ 9, 10.)  The objection is overruled.  Defendants proffer Saleh's statements not for their truth but as circumstantial evidence of Labate's and Schwarz's state of mind.  (Dkt. No. 36, Reply Memorandum of Law in Support of Motion for Summary Judgment ("Reply Memo"), at 2 n.2.)  Saleh's statements are therefore not hearsay.  *See Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005).

Cadillac then arrived at the intersection and stopped directly behind a motorcycle at a red light.[5]

(*Id.* at 44:15–19; Def. 56.1 Stmt ¶ 19.)

What followed is partly in dispute. Labate and Schwarz's account[6] is that they exited

their vehicle at this point with their police shields around their necks and their weapons drawn.

(Labate Aff. ¶ 14.) Labate, who was on the driver's side, walked into the street, while Schwarz

exited from the passenger's side onto the sidewalk on the north side of 188th Street. (Schwarz

Dep. 44:19–23.) While approaching the Cadillac, they identified themselves as police and yelled

at the driver—now known to be Peguero—to "stop the car." (*Id.* at 44:23–25.) As they did so,

the Cadillac accelerated forward and struck the motorcycle stopped in front of it. (*Id.* 45:20–23;

Labate Aff. ¶ 13.) The motorcyclist, Juan Castillo, fell to the ground on his right side and

became "pinned under his motorcycle." (Def. 56.1 Stmt ¶ 25; Schwarz Dep. 48:24–49:4.) The

Cadillac continued to accelerate, but could not move because the motorcycle was lodged under

its front bumper. (Labate Aff. ¶ 15.) Labate and Schwarz were "screaming at the car to stop."[7]

(Schwarz Dep. 49:9–11.) As Labate approached the Cadillac, he noticed a group of civilians,

including children, on the south side of 188th Street. (Labate Aff. ¶ 16.)

The Cadillac then reversed "at a high rate of speed," "swerv[ed]" and hit a car behind it

on the street.[8] (*Id.* 49:9–19.) Seated in the car to the rear of the Cadillac were Javier Kaufman

---

[5] Schwarz also referred to "a van stopped at the light" in his deposition (Schwarz Dep. 44:17–18), but neither Labate nor civilian witnesses mentioned such a van.

[6] As noted herein, parts of the officers' account are undisputed. Other portions, Plaintiffs argue, are contradicted by the accounts of civilian witnesses. Those portions are noted below.

[7] Plaintiffs concede that the Cadillac, driven by Peguero, struck and then pinned the motorcycle under its front end. (*See* Pl. 56.1 Stmt ¶¶ 23–26.)

[8] Plaintiffs also concede that the Cadillac reversed and struck several vehicles behind it. (*See* Pl. 56.1 Stmt ¶¶ 27–28.) Labate states that the Cadillac struck both "parked cars and . . . a vehicle that was behind it on 188th Street." (Labate Aff. ¶ 17.)

and his mother, Violeta Abad.  Kaufman says that the Cadillac struck his vehicle three times. (Def. 56.1 Stmt ¶ 32; Kaufman Dep. 35:17–19.)  The crashes sent the back of Kaufman's car "up in the air" and turned it "perpendicular to the street" such that it blocked 188th Street behind the Cadillac.  (Schwarz Dep. 50:15–20; Def. 56.1 Stmt ¶ 28.)  The Cadillac then came to a stop.  (*Id.* at 50:23.)  Schwarz, who described the collision as "violent," observed "smoke" and "debris." (*Id.* at 50:20–24.)  The crash injured both Kaufman and Abad.  (Def. 56.1 Stmt ¶¶ 33–34.)

At that point, Schwarz and Labate remained, respectively, on the sidewalk and in the street.  (Schwarz Dep. 51:3–7.)  Labate was in front of the vehicle, "approximately one and a half car lengths away," and "ordered the driver to stop the car multiple times."  (Labate Aff. ¶¶ 18, 20.)  As he and Schwarz approached the Cadillac, Peguero accelerated forward directly towards Labate "at a high rate of speed."  (*Id.* ¶ 21; Schwarz Dep. 50:24–51:8.)  Labate, who "feared for [his] safety and believed [he] was in imminent danger," backpedaled and fired one shot through the Cadillac's front windshield.  (Labate Aff. ¶¶ 23–24.)  The shot struck Peguero. The Cadillac veered left and hit a parked car on the north side of the street.  (*Id.* ¶ 25.)  It then immediately went into reverse, making "almost a semi-circle," crashing into another car on the street's north side, and pushing the car onto the sidewalk such that it "almost hit" Schwarz. (Schwarz Dep. 53:7–12; Labate Aff. ¶¶ 27–28.)  Wendy Alcantara, who appears to have been seated in this second car,[9] suffered a broken nose, nerve damage, and swelling in one of her legs as a result of the crash.  (Def. 56.1 Stmt ¶¶ 41–42.)

---

[9] Labate recalls that Alcantara was seated in the first car (Labate Aff. ¶ 25–28), while Schwarz says that she was in the second (Schwarz Dep. 53:12).  Alcantara's own recollections seem to support Schwarz's view: she testified that the "left side" of the Cadillac hit her car, and that the Cadillac was "going in reverse" when it struck her.  (Modafferi Decl. Ex. L, Deposition of Wendy Alcantara ("Alcantara Dep."), 27:11–13, 28:8–10.)

Labate was still in the street at that point, standing between the Cadillac and parked cars on the south side of the street.  He "continued yelling for the car to stop."  (Labate Aff. ¶ 29.)  Nonetheless, the Cadillac accelerated directly toward Labate.  (*Id.* ¶ 30.)  Labate jumped out of the way and fired a second shot through the Cadillac's front passenger door toward the driver.  (*Id.* ¶ 31.)  The Cadillac "pinballed," colliding with the parked cars on the south side of the street, and then reversing and hitting cars parked on the north side of the street.  (Schwarz Dep. 53:12–20; Labate Aff.  ¶¶ 34–35.)  The Cadillac became wedged between two parked cars, but its wheels continued to spin in reverse and its "engine was revving very high."  (Schwarz Dep. 54:19.)  Schwarz ordered Labate to cease fire.  (*Id.* at 54:20–21.)  Labate approached the Cadillac and reached into the driver's side to turn the vehicle off.  (*Id.* at 55:2–3; Labate Aff. ¶ 38.)  The driver was "unresponsive," and Schwarz made a radio transmission to "[r]ush the ambulance."  (Schwarz Dep. 55:10, 55:23.)  Labate and Schwarz ordered the three remaining passengers to keep their hands up. (Labate Aff. ¶ 37.)  Medical personnel who arrived at the scene shortly thereafter found Peguero to be "unresponsive, apneic, [and] pulseless."  (Modafferi Decl. Ex. M, at 2.)

Plaintiffs argue that several aspects of Labate and Schwarz's narrative are contradicted by the accounts of civilian witnesses.

*First*, two witnesses stated that Labate and Schwarz did not identify themselves as police to the occupants of the Cadillac.  (*See* Wotorson Aff. Ex. 3, Deposition of Juan Castillo ("Castillo Dep."), 39:24–40:5 (testifying that the officers only said "get out of the car"); *id.* Ex. 2, Deposition of Violeta Abad ("Abad Dep."), 21:5–8 (deposing that she did not hear the officers say that they were police before shots were fired).)

6

*Second*, multiple witnesses testified that the officer who fired the shots was not in front of the car.  (*See* Castillo Dep. 38:5–39:6 (the officer who fired shots was "on the passenger side of the vehicle and not in front"); Wotorson Aff. Ex. 4, Deposition of Glorys Hidalgo ("Hidalgo Dep."), 32:2–7 (officer observed to be shooting was "on the sidewalk"); *id.* Ex. 1, Deposition of Javier Kaufman ("Kaufman Dep."), 41:20–21, 48:5–14 (same).)

*Third*, one witness denies that the driver of the Cadillac was attempting to run over Labate.[10]  (Hidalgo Dep. 29:2–6 ("[The Cadillac] wasn't going towards the guy.").)

*Fourth*, two witnesses testified that the police fired shots at the Cadillac while it was moving in reverse or had stopped.  (Alcantara Dep. 34:19–21 (first testifying that shots were fired "after [the car] went in reverse and then came to a stop," but then clarifying that she heard shots "while the car was moving in reverse"); Modafferi Decl. Ex. Q, Deposition of Jose Ramos ("Ramos Dep."), 22:12–19 (stating that he heard gunshots when the Cadillac "wasn't moving at all")).

*Fifth*, one witness testified, contrary to Labate's testimony, that there were not "a lot of civilians" in the vicinity of the incident.  (Alcantara Dep. 45:12–15.)

*Sixth*, and finally, a single witness affirmed that she observed a "police officer fire[] shots as soon as he got out of the car."  (Wotorson Aff. Ex. 7, Affidavit of Alexandra Tavarez ("Tavarez Aff."), ¶ 2.)

### B.  Procedural History

---

[10] Plaintiffs also cite the evidence of Castillo and Kaufman for this point.  But neither of these witnesses' testimony is helpful to Plaintiffs.  As Plaintiffs themselves acknowledge, Castillo testified that the Cadillac "lunged forward" toward the "police officer who was in front of the car," who "could've gotten run over" but "jumped out of the way."  (Castillo Dep. 41:1–8.) Kaufman, for his part, testified that the Cadillac was "moving forward in the direction of the police officer."  (Kaufman Dep. 42:15–20.)

Plaintiffs filed their complaint on July 3, 2012 (Dkt. No. 1 ("Compl.")), and Defendants answered on December 12, 2012 (Dkt. No. 6).  After discovery, Defendants filed this motion for summary judgment on June 13, 2014.  (Dkt. No. 22.)  Plaintiffs filed an opposition to the motion on September 10, 2014 (Dkt. No. 32), and Defendants submitted a reply in support of the motion on September 25, 2014 (Dkt. No. 36).

## II.   Discussion

Plaintiffs assert two claims against Defendants under Section 1983, first for loss of companionship and association, and second for excessive force.[11]  Neither claim succeeds: the first because it is not actionable under Section 1983, and the second because there is no genuine

---

[11] The Court construes the Complaint, which is not a model of clarity, as asserting a claim for excessive force on behalf of Peguero's estate and a claim for loss of companionship on Plaintiffs' own behalf.  In the event that Plaintiffs intended also to assert a claim for deprivation of Peguero's substantive due process right to life, that claim is dismissed because the alleged conduct here constitutes a "seizure" within the meaning of the Fourth Amendment.  *See Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." (citations, internal quotation marks, and emphasis omitted)).  Plaintiffs' cause of action is therefore properly asserted under the Fourth Amendment, not under the substantive due process clause of the Fourteenth Amendment.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)) (internal quotation marks omitted)).

Because Plaintiffs have not pleaded claims under state law, it is unnecessary for the Court to decide whether, as Defendants contend, any such claims would be time-barred.  Even if Plaintiffs had asserted state law claims, however, the Court would decline to exercise jurisdiction over such claims because no federal claims would remain.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks omitted)); *see also* 28 U.S.C. § 1367(c)(3).

dispute of material fact as to whether Labate and Schwarz's conduct ran afoul of the Fourth Amendment.

### A.      Legal Standard

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (brackets and internal quotation marks omitted). A fact is material if it "might affect the outcome of the suit under the governing law," *Liberty Lobby*, 477 U.S. at 248, and there is a genuine issue for trial where, considering the record as a whole, a rational trier of fact could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"It is the movant's burden to show that no genuine factual dispute exists," and the court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant meets its burden, the burden shifts to the non-moving party to demonstrate that there is, in fact, a genuine issue for trial. *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). A court cannot "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact" on a motion for summary judgment, but neither can it permit the non-moving party to rely upon "conclusory statements, conjecture,

or speculation." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal quotation marks omitted).

**B.      Claims Against the City of New York**

Plaintiffs assert claims not only against Labate and Schwarz, but also against the City of New York.  The Complaint alleges that "uniformed and non-uniformed members of the [NYPD] actively sought to muzzle and to suppress any evidence of wrongdoing o[n] [Labate and Schwarz's] part" (Compl. ¶ 20), and that officers "erased video footage capturing members of the [NYPD] exacting physical revenge upon the occupants of the vehicle operated by . . . Peguero for having taken them . . . on a pursuit" (*id.* ¶ 21).  Plaintiffs pleaded, further, that "it is a long-standing practice that suspects allegedly fleeing police are subjected to excessive uses of force once such chases are terminated."  (*Id.* ¶ 25.)  Defendants argue that summary judgment is warranted because Plaintiffs have provided no evidence for these allegations.  (Dkt. No. 25, Memorandum of Law in Support of Motion for Summary Judgment ("Def. Memo"), at 5.)  The Court agrees.

To hold a municipality liable under Section 1983, a plaintiff must prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).  Local governments are not vicariously liable for the acts of their employees, and plaintiffs "must prove that action pursuant to official municipal policy caused their injury."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)) (internal quotation marks omitted).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.*  A

municipality may also be liable for failure to train its employees if it amounts to "deliberate indifference" to persons with whom the employees come into act.  *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)) (internal quotation marks omitted).  Whatever its form, the municipal policy must be the "moving force" behind the plaintiff's injury.  *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

In opposing summary judgment on the *Monell* claims, Plaintiffs rely exclusively on the argument that the City may be held liable by virtue of Schwarz's conduct.  (Opp. Memo at 10–11.)  Plaintiffs reason that because Schwarz had "supervisory authority" over Labate[12] and personally participated in the violation of Peguero's constitutional rights, his conduct may form the basis of a *Monell* claim.  (*Id.* (quoting *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).)

This argument confuses municipal and supervisory liability.  A supervisor's "direct participation" in a constitutional violation—even if that participation takes the form of "ordering or helping others to do the unlawful acts"—is a means to establish that the supervisor had "personal involvement" in the violation and is therefore liable for damages under Section 1983. *See Provost*, 262 F.3d at 154–55.  But it is not sufficient to hold a municipality liable.  To subject the City of New York to liability under Section 1983, Schwarz would have to be an official with "final policymaking authority."  *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks omitted).  It is clear, as a matter of law, that Schwarz—who held the position of sergeant—was not.  *See Anthony v. City of New York*, 339 F.3d 129, 139–40 (2d Cir. 2003)

---

[12] Schwarz testified that, as a sergeant, he was the ranking officer on the scene.  (Schwarz Dep. 50:4–11.)

(Sotomayor, J.) (concluding that "a police sergeant in the NYPD" was not a "final decision-maker"); *Damato v. City of New York*, No. 06 Civ. 3030 (DC), 2008 WL 2019122, at *2 (S.D.N.Y. May 12, 2008) (same).

Plaintiffs do not oppose summary judgment as to claims against the City of New York on any other grounds, and they have not marshaled evidence that supports the other allegations in the Complaint that bear on municipal liability.  The Court therefore treats these claims as abandoned, *see Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998), and grants Defendants' motion for summary judgment on the municipal claims.

### C.  Loss of Companionship Claim

Plaintiffs bring a claim in their individual capacities for loss of companionship.  They assert that Defendants' actions deprived them of their constitutional right to Peguero's companionship and association, in violation of Section 1983.  (Compl. ¶¶ 30–31.)  Plaintiffs pleaded that they "maintained a close relationship with their son, of which they now have been deprived, causing them severe emotional distress."  (*Id.* ¶ 24.)  This claim fails as a matter of law.

"While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds they may not."  *Harrison v. Harlem Hosp.*, No. 05 Civ. 8271 (WHP), 2007 WL 2822231, at *4 (S.D.N.Y. Sept. 28, 2007), *aff'd*, 364 F. App'x 686 (2d Cir. 2010) (summary order).  That weight includes district courts in this circuit and the majority of the federal courts of appeals.  *See, e.g.*, *id.*;[13]

---

[13] In *Harrison*, the district court dismissed the plaintiffs' individual claims under 42 U.S.C. §§ 1983 and 1985 for loss of their mother's companionship.  2007 WL 2822231, at *4.  The Second Circuit's nonprecedential affirmance held the individual claims to be "without merit."  364 F. App'x at 688.

*Wahhab v. City of New York*, 386 F. Supp. 2d 277, 292 (S.D.N.Y. 2005) ("[Section] 1983 does not support derivative claims for loss of consortium."); *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190–91 (3d Cir. 2009) ("[T]he fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child." (internal quotation marks omitted)); *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005) (concluding that parents have no "constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action"); *Soto v. Flores*, 103 F.3d 1056, 1062 (1st Cir. 1997) ("[T]he death of a family member will not ordinarily give those still alive a cognizable due process claim under section 1983.").  And though courts have stated that a loss of companionship claim may be cognizable where the state seeks deliberately to interfere with a familial relationship, *see e.g.*, *Chambers*, 587 F.3d at 192; *Russ*, 414 F.3d at 789, there is no evidence suggesting that Labate's and Schwarz's actions were directed to that end.  Summary judgment is accordingly granted to Defendants on Plaintiffs' claim for the loss of Peguero's companionship and association.[14]

   **D.    Fourth Amendment Claims**

   The Court now turns to the excessive force claims against Labate and Schwarz.  Each individual defendant is considered in turn.

---

[14] Plaintiffs cite *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239 (S.D.N.Y. 2001), for the proposition that Section 1983 is "broad enough to encompass derivative damage claims that State statutes bar or fail to address, including loss of consortium claims suffered by parents of decedents."  (Opp. Memo at 11–12.)  *Banks* is inapposite here, however.  It considered a claim for "loss of enjoyment of life as a component of recovery" of the excessive force case brought on behalf of the decedent by his estate, 177 F. Supp. 2d at 247, and expressly declined to address the decedent's mother's "individual Due Process claim of right to the companionship of her son," which the plaintiff had withdrawn at trial, *id.* at 243 n.1.

### 1.  Labate

The Court first considers whether Labate's conduct constituted excessive force, and second, whether he is entitled to qualified immunity.

### a.  Excessive Force

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor,* 490 U.S. 386 (1989); *Tennessee v. Garner,* 471 U.S. 1 (1985)).  That standard asks whether an officer's actions "were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397).

Assessing whether an officer's use of force was reasonable within the meaning of the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  The court must view the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and with the appreciation "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396–97) (internal quotation marks omitted).

At the outset, there is a question about what standard the Court should apply in judging the objective reasonableness of the officers' conduct here.  In *Graham*, the Supreme Court noted that a court's analysis of the reasonableness of the use of force in effecting a seizure is to be

14

informed by at least three factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396). In *Garner*, the Court held that that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11. The Second Circuit has construed *Garner* as enunciating a standard for determining the objective reasonableness of an officer's decision to use deadly force and has applied it as such. *See, e.g.*, *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003) ("It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."); *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (same). In other words, the Second Circuit understood *Garner* as creating a prerequisite to an officer's use of deadly force against a suspect.

The Supreme Court called into question that understanding in its 2007 decision in *Scott v. Harris*, where it sought to clarify the proper meaning of *Garner*. At issue in *Scott* was whether an officer's decision to apply his push bumper to a suspect's vehicle during a high-speed pursuit—causing the suspect to lose control of his vehicle and crash, leaving him severely injured and a paraplegic—was objectively reasonable. 550 U.S. at 375. In addressing the reasonableness of the officer's use of force, the Court clarified that "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation" and "did not establish a magical on/off switch that triggers rigid

preconditions whenever an officer's actions constitute 'deadly force.'" *Id.* at 382 (citation

omitted). *Garner*, the Court explained, addressed the reasonableness of shooting a "young,

slight, and unarmed" burglary suspect "in the back of the head" while he escaped on foot. *Id.*

(quoting *Garner*, 471 U.S. at 21) (internal quotation marks omitted). *Garner*'s so-called

"preconditions" to the use of force, therefore, had "scant applicability" to the facts in *Scott*. *Id.*

The Second Circuit has interpreted *Scott* not as abrogating the *Garner* rule, but as

limiting its application to a smaller class of cases. As the Second Circuit explained it, *Scott*

"held that *Garner* does not apply in cases involving accidents that occur when police attempt to

stop a vehicle." *Terranova v. New York*, 676 F.3d 305, 309 (2d Cir. 2012). In these cases, the

"usual reasonableness analysis" applies. *Id.* at 308. In cases where an officer's "use of force [is]

highly likely to have deadly effects," however, the Second Circuit later reasoned that the *Garner*

standard continued to apply: that is, deadly force used to apprehend a suspect is not objectively

reasonable "unless the officer has probable cause to believe that the suspect poses a significant

threat of death or serious physical injury to the officer or others." *Rasanen v. Doe*, 723 F.3d 325,

333 (2d Cir. 2013) (quoting *O'Bert*, 331 F.3d at 36).

The Supreme Court's recent decision in *Plumhoff*, however, appears to overrule this

holding by implication and cast doubt on the continuing survival of the *Garner* rule as distinct

from a general reasonableness inquiry. The facts of *Plumhoff* share significant similarities with

those of this case. Police officers initiated a high-speed car chase of a suspect after he fled the

scene of a police stop. 134 S. Ct. at 2017. The car led a police pursuit on an interstate highway,

where the vehicles "swerv[ed] through traffic" and reached speeds over 100 miles per hour. *Id.*

(internal quotation marks omitted). When the driver eventually exited the highway, his car made

a contact with a police cruiser, causing the car to "sp[i]n out into a parking lot and collide[] with"

16

another cruiser.  *Id.*  The driver attempted to escape the parking lot, but could not: his car's bumper "was flush against a police cruiser," its wheels spinning and the car "rocking back and forth."  *Id.* (internal quotation marks omitted).  At that point, one officer fired three shots into the car.  *Id.*  The driver "reversed in a 180 degree arc and maneuvered onto another street."  *Id.* (internal quotation marks omitted).  As the suspect's car sped away, two other officers fired a total of twelve shots at the car.  *Id.* at 2018.  The driver lost control of the car and crashed into a building.  *Id.*  The driver and sole passenger in the car died from a combination of the gunshot wounds and the crash.  *Id.*

The Supreme Court held that the officers' conduct did not violate the Fourth Amendment. It followed its holding in *Scott* that a "police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."  *Id.* at 2021 (quoting *Scott*, 550 U.S. at 386) (internal quotation marks omitted).  The Court emphasized that the driver's "outrageously reckless driving posed a grave public safety risk," and that force was warranted even when the car's wheels were spinning because "all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight."  *Id.* at 2021–22.  Allowing him to do so would have created a "deadly threat for others on the road."  *Id.* at 2022.

*Plumhoff*'s facts, therefore, place it squarely among cases where an officer's use of force is "highly likely to have deadly effects."  *See Rasanen*, 723 F.3d at 334 n.5 (noting that "firing a gun aimed at a person" is a use of force likely to have deadly effects).  The Court acknowledged that "[a] claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard," but did not look to the question under

17

*Garner* of whether the officers had probable cause to believe that the suspect was dangerous. 134 S. Ct. at 2020.  Nor did *Plumhoff* mention the *Graham* factors.  Rather, it instructed that assessing the objective reasonableness of an officer's use of force "requires analyzing the totality of the circumstances."  *Id.* at 2020 (citing *Graham*, 490 U.S. at 396).

Ultimately, the choice of analysis does not change the result here.  Whether analyzed under the *Garner* rule, the *Graham* factors, or the *Scott/Plumhoff* totality of the circumstances standard, there is no genuine dispute of material fact as to whether the officers' conduct constituted excessive force.  For the purposes of the analysis below, therefore, the Court follows *Rasanen* and proceeds on the basis that *Garner*—the most stringent of the above standards—is controlling.

No reasonable jury could conclude that Labate's conduct constituted excessive force. Nearly all—if not all—of the essential facts surrounding this incident are undisputed.  Labate had a reasonable belief, based on a complaint made to the police, that Peguero and the passengers in the Cadillac had committed an armed robbery.  Labate also had a reasonable belief, based on a radio transmission, that the Cadillac had rammed a police car when it attempted to stop him.  When confronted by Labate and Schwarz at the corner of 188th Street and Amsterdam Avenue, the Cadillac accelerated forward, striking Castillo and pinning him and his motorcycle under the car.  The Cadillac subsequently reversed and struck two cars containing civilian passengers.  All of these passengers—Kaufman, Abad, and Alcantara—were injured.  In sum, Labate had probable cause to believe that Peguero posed "a significant threat of death or serious physical injury" to those around him.  *Rasanen*, 723 F.3d at 333.  The interest in ending that threat justified both Labate's first and second shots at the Cadillac.  *See Plumhoff*, 134 S. Ct. at 2022 ("It stands to reason that, if police officers are justified in firing at a suspect in order to end

a severe threat to public safety, the officers need not stop shooting until the threat has ended.").
It is beyond genuine dispute that Labate's use of deadly force was, therefore, objectively
reasonable.

None of the evidence in the record alters this conclusion. *First*, some witnesses testified
that the officers did not explicitly identify themselves as police. Assuming this is true, it
nonetheless does not, in and of itself, render Labate's use of force unreasonable. Putting aside
the merits of Plaintiffs' contention that the Cadillac passengers "reasonably could have assumed
that [Labate and Schwarz] were civilians who sought to cause them harm" (Opp. Memo at 14),
no witness contradicts Labate's and Schwarz's testimony that they wore their shields around
their necks when they exited their car.[15]  (*See* Labate Aff. ¶ 14; Schwarz Dep. 44:23–24.)  Nor is
it obvious, as Plaintiffs assume, that an officer's failure to identify himself divests him of the
right to use force. *See Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009) (Cudahy, J.)
("[I]t is far from clearly established that the Fourth Amendment requires police officers to
identify themselves in the course of carrying out an arrest in a public place." (citing, *inter alia*,
*Sanchez v. City of New York,* No. 96 Civ. 7254 (SHS), 2000 WL 987288, at *5 (S.D.N.Y. July
17, 2000))).

*Second*, the fact that some witnesses say that the officer who shot Peguero was not in
front of the car does not create an issue of material fact. Even assuming that Labate discharged
his firearm from the sidewalk or from "the side of the vehicle" (Castillo Dep. 38:5–18) and that
there was no officer in the street in danger of being hit by the Cadillac, Labate would have had
probable cause to believe, as the officer in *Plumhoff* did, that the Cadillac posed a threat to

---

[15] Castillo, who denied that the officers identified themselves as police, also testified that he
could tell immediately on seeing the officers that they were police based on their appearance and
that of their car.  (Castillo Dep. 39:8–11.)

civilians—both nearby and elsewhere, had Peguero successfully escaped from 188th Street.  It is clear that Labate's actions were reasonable, even if he was not directly in front of the car.

The same reasoning forecloses the *third*, *fourth*, and *fifth* of the facts that Plaintiffs claim are in dispute: (1) whether the Cadillac was, in fact, driving towards Labate; (2) whether the Cadillac was driving forward at the time the shots were fired; and (3) whether there were "a lot of civilians" in the surrounding area.  First, Plaintiffs are incorrect to suggest that the reasonableness of the use of force hinges on whether Peguero actually attempted to hit Labate with the Cadillac.[16]  (Opp. Memo at 14–15.)  Even if Peguero did not intend to hit Labate, the use of deadly force was reasonable because he had sufficient grounds to believe that the Cadillac posed a serious threat to others.  Moreover, none of the witnesses suggests that the Cadillac was actually stationary at the time the shots were fired.  Instead, the two witnesses cited by Plaintiffs state that the car was either in motion or attempting to move: Alcantara said that it was moving in reverse (*see* Alcantara Dep. 34:19–21),[17] while Ramos stated that the Cadillac was "stuck" but "kept shaking back and forth" as it was "trying to move" (Ramos Dep. 36:17–18).  The fact that the Cadillac was moving in reverse certainly does not mean that it posed no threat, and even assuming that Ramos's testimony is correct, Labate—like the officer in *Plumhoff*, who was confronted with a car whose "wheels were spinning"—reasonably "could have concluded . . . that [Peguero] was intent on resuming his flight."  134 S. Ct. at 2021–22.  Last, the fact that there

---

[16] Plaintiffs incorrectly assert that "[n]ot a single civilian witness who was deposed agrees that Peguero attempted to mow down Labate with the Cadillac" (Opp. Memo at 13).  In fact, Castillo testified that the car "lunged forward" at the shooting officer and he "jumped out of the way" because he "could've gotten run over."  (Castillo Dep. 40:18–41:8.)

[17] As noted above, Alcantara suggested initially that the shots were fired after the Cadillac had stopped (Alcantara Dep. 34:10–12), but soon after clarified, "I think I heard the shots while the car was moving in reverse, if I'm not mistaken" (*id.* at 34:20–21).

were not "a lot of civilians" nearby (Alcantara Dep. 45:14–15), even if true, does nothing to change the fact that there were undisputedly *some* civilians—including Castillo, Kaufman, Abad, and Alcantara herself—who were in harm's way.

*Sixth*, and finally, Tavarez's affidavit creates no genuine issue of material fact for trial. Tavarez's testimony—that "[t]he police officer fired shots as soon as he got out of the car" (Tavarez Aff. ¶ 2)—is contained in a two-page, translated affidavit that is short on both context and specificity. But even assuming the truth of its allegations, it creates no genuine issue for trial because Tavarez says that the officers fired shots only after she saw "the car that was being chased[] crash." (*Id.*) There is no indication as to which crash Tavarez witnessed, but regardless, it would have been one that posed a risk of serious physical harm to the civilians nearby.[18]

In sum, even when the various discrepancies in the record are interpreted in the light most favorable to Plaintiffs, there is no genuine dispute as to the conclusion that Labate's use of force was reasonable.

---

[18] Even in the absence of this conclusion, Tavarez's affidavit stating that Labate fired shots as soon as he exited his car is insufficient to create a genuine issue of material fact because it is directly at odds with the evidence in the record. *See Bezuidenhout v. Abbott Labs. & Co.*, 918 F. Supp. 2d 144, 157 (E.D.N.Y. 2013) ("[E]ven an affidavit with non-conclusory statements may, in some cases, be insufficient to create a factual issue when . . . it constitutes almost the sole or exclusive basis for a disputed issue of fact in the case . . . ."); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (finding, in the context of the case, that testimony "unsupported by documentary or other concrete evidence . . . is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Liberty Lobby*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."). The Court concludes that no reasonable jury could find in Plaintiffs' favor on the basis of Tavarez's affidavit, even if it were not consistent with Peguero's posing a risk of serious harm to bystanders.

### b.    Qualified Immunity

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (citing *Saucier v. Katz*, 553 U.S. 194, 206 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).  A defendant is entitled to qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks omitted).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009) (quoting *Saucier*, 553 U.S. at 202) (internal quotation marks omitted).  In determining whether a right is clearly established, courts look to Supreme Court and Second Circuit precedent existing at the time of the alleged constitutional violation.  *Id.*

The Supreme Court has cautioned that the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (internal quotation marks omitted).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In *Brosseau*, for example, the Court held that the defendant was entitled to qualified immunity because no precedent "squarely govern[ed] the case."  543 U.S. at 201.  The situation the defendant confronted was "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200.  In reversing the Ninth Circuit's

determination that the defendant was not entitled to qualified immunity, the Court noted that its Fourth Amendment decisions in *Graham* and *Garner* "are cast at a high level of generality," and that the result in cases akin to *Brosseau* will turn on the facts of the individual case. *Id.* at 199, 201.

In *Plumhoff*, discussed above, the Supreme Court held that the defendants were entitled to qualified immunity because their conduct did not violate law that was clearly established on July 18, 2004, the date of the relevant conduct. As the Court explained: "*Brosseau* makes plain that as of February 21, 1999—the date of the events at issue in that case—it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." 134 S. Ct. at 2023. To prevail, the Court continued, the plaintiff would have to show either "(1) that the officers' conduct in this case was materially different from the conduct in *Brosseau* or (2) that between February 21, 1999, and July 18, 2004, there emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis of the qualified immunity question." *Id.* (citation and internal quotation marks omitted). Because the plaintiff in *Plumhoff* made neither showing, the defendants were entitled to qualified immunity.

That reasoning controls here: even if the Court concluded that Labate violated Peguero's constitutional rights, Labate would be entitled to qualified immunity.[19] Labate's conduct was

---

[19] *Cowan*, 352 F.3d 756, does not alter this conclusion. There, the Second Circuit upheld a district court's denial of summary judgment in a suit against an officer who was alleged to have used excessive force in fatally shooting the driver of a car. *Id.* at 765. The Second Circuit found that the plaintiff's version of the facts "suggest[ed] that [the officer] was not in danger of death or even physical harm when he fired the fatal shot." *Id.* at 763. The officer "would be entitled to qualified immunity if he reasonably believed at the moment he fired at [the driver] that she posed a significant threat of death or serious physical harm to him or others," but there was a genuine issue of fact on that point, precluding summary judgment. *Id.* at 764.

materially different from that of the officer in *Brosseau*—but in that it was more reasonable, not less.  In *Brosseau*, the officer fired a shot at a suspect fleeing in a vehicle because she was "fearful for the other officers on foot who she believed were in the immediate area, and for the occupied vehicles in [the suspect's] path and for any other citizens who might be in the area." 543 U.S. at 197 (brackets and internal quotation marks omitted).  At the time of the shooting, the officer knew that the suspect "had a felony no-bail warrant for a nonviolent drug offense, was suspected in a nonviolent burglary, and had been fleeing from law enforcement on foot for approximately 30 to 45 minutes without incident."  *Id.* at 204 n.2.  In this case, in contrast, Labate reasonably believed that passengers in the Cadillac were armed and dangerous and that the Cadillac had previously rammed another police car in order to evade arrest.  Furthermore, Labate had concrete evidence, rather than merely well-founded suspicions, that Peguero posed a serious threat to those around him due to Peguero's dangerous collisions with other vehicles during his repeated attempts to flee.  Because Labate's conduct was not more unreasonable than that of the officer in *Brosseau*, and because Plaintiffs have not pointed to "controlling authority or a robust consensus of cases of persuasive authority" that emerged between February 21, 1999, and July 22, 2009, Labate was not on notice that any of his conduct could have been unlawful. He is therefore entitled to qualified immunity.

---

Here, in contrast, there is no such genuine issue of fact.  The undisputed evidence is that Labate reasonably believed that Peguero posed a serious risk of harm to the officers and others. *Cowan* does not, therefore, clearly establish law relevant to Labate's conduct.  *See O'Brien v. Barrows*, No. 1:10-cv-173-JGM, 2013 WL 486655, at *8 (D. Vt. Feb. 7, 2013) ("*Cowan* stands for the proposition that an officer should not shoot at a fleeing motorist who poses no apparent threat to the officer or others.  Flight, without more, is insufficient to support the use of deadly force.  Yet [the officer here] had reason to believe the Plaintiff posed a threat to other drivers, as well as himself.  *Cowan* does not make the unlawfulness of his conduct apparent." (citations omitted)), *aff'd*, 556 F. App'x 2 (2d Cir. 2014) (summary order).

Defendants' motion for summary judgment is granted on Plaintiffs' claim that the force used by Labate violated the Fourth Amendment.

## 2.  Schwarz

Plaintiffs also argue that Schwarz is liable for his failure to intervene and halt Labate's allegedly unconstitutional conduct.  "Failure to intercede results in liability where an officer observes [that] excessive force is being used or has reason to know that it will be."  *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  In order for the officer to be held liable, "there must have been a realistic opportunity to intervene to prevent the harm from occurring."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Plaintiffs contend that there is a genuine dispute of fact about whether Schwarz had a realistic opportunity to intervene.  But that argument assumes (1) that the force employed by Labate was excessive and (2) that Schwarz would not be entitled to qualified immunity.  Neither assumption can stand.  As explained above, Labate's conduct was, in the circumstances of the tense and rapidly evolving situation before him, objectively reasonable.  And qualified immunity protects Schwarz from suit unless he knew or had reason to know that Labate's conduct ran afoul of clearly established law.  Because it did not, Schwarz is not liable for his failure to intervene.

Accordingly, Defendants' motion for summary judgment is granted as to the excessive force claim against Schwarz.

**III.    Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at docket number 22 and to close this case.


SO ORDERED.

Dated:  March 16, 2015
        New York, New York

_____
                                        J. PAUL OETKEN
                                  United States District Judge